# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

THERESA GUINN SMITH,      )
     Plaintiff      )
v.      )    Civil Action No. 2:15cv00018
     )    **MEMORANDUM OPINION**
**CAROLYN W. COLVIN,**      )
**Acting Commissioner of**      )
**Social Security,**      )
     Defendant      )    By:    PAMELA MEADE SARGENT
     )    United States Magistrate Judge

## *I. Background and Standard of Review*

Plaintiff, Theresa Guinn Smith, ("Smith"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

Case 2:15-cv-00018-PMS   Document 15   Filed 02/10/17   Page 1 of 23   Pageid#: 899

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Smith protectively filed her applications for DIB and SSI on January 30, 2014, alleging disability as of January 1, 2013, due to disc degeneration in her back and neck; depression; anxiety; panic attacks; bulging discs; suicidal ideation; and diabetes mellitus. (Record, ("R."), at 9, 243-46, 257-64, 271.) The claims were denied initially and upon reconsideration. (R. at 124-26, 131, 133-35, 137-42, 144-46.) Smith then requested a hearing before an administrative law judge, ("ALJ"). (R. at 147.) A video hearing was held on May 19, 2015, at which Smith was represented by counsel. (R. at 29-59.)

By decision dated June 12, 2015, the ALJ denied Smith's claims. (R. at 9-23.) The ALJ found that Smith met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2017. (R. at 11.) The ALJ found that Smith had not engaged in substantial gainful activity since January 1, 2013, the alleged onset date.[1] (R. at 11.) The ALJ found that the medical evidence established that Smith had severe impairments, namely cervical and lumbar spine degenerative disc disease; mild to moderate hearing loss; diabetes mellitus;

---

[1] Therefore, Smith must show that she was disabled between January 1, 2013, the alleged onset date, and June 12, 2015, the date of the ALJ's decision, in order to be eligible for DIB benefits.

fibromyalgia; restless leg syndrome; carpal tunnel syndrome with normal nerve conduction studies and EMG; depressive disorder; and anxiety disorder, but she found that Smith did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 12.) The ALJ found that Smith had the residual functional capacity to perform simple, repetitive, unskilled, light work[2] that did not require more than occasional pushing and pulling, climbing of ramps and stairs, balancing, kneeling, stooping, crouching and crawling; that did not require more than frequent overhead reaching, handling, feeling and fingering; that did not require her to work around concentrated exposure to extreme temperatures; that did not expose her to hazardous machinery, unprotected heights, excessively loud background noise, climbing of ladders, ropes or scaffolds and vibrating surfaces; and that did not require more than occasional interaction with the general public. (R. at 15.) The ALJ found that Smith was unable to perform her past relevant work. (R. at 21.) Based on Smith's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Smith could perform, including jobs as a nonpostal mail clerk, an order clerk and an office helper. (R. at 21-22.) Thus, the ALJ concluded that Smith was not under a disability as defined by the Act, and was not eligible for DIB or SSI benefits. (R. at 22-23.) *See* 20 C.F.R. §§ 404.1520(g) 416.920(g) (2016).

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2016).

After the ALJ issued her decision, Smith pursued her administrative appeals, (R. at 5), but the Appeals Council denied her request for review. (R. at 1-3.) Smith then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2016). This case is before this court on Smith's motion for summary judgment filed March 2, 2016, and the Commissioner's motion for summary judgment filed April 4, 2016.

## II. Facts

Smith was born in 1961, (R. at 34, 243, 257), which, at the time of the ALJ's decision, classified her as a "person closely approaching advanced age" under 20 C.F.R. §§ 404.1563(d), 416.963(d). Smith has a high school education and some college education and past work experience as a certified nursing assistant and a personal care attendant. (R. at 34-36, 272.) Smith testified that she suffered from emotional problems due to the death of two children and the death of her husband and only sister. (R. at 34.) She stated that she lost one child due to crib death and that her 17-year-old child was killed by a drunk driver. (R. at 34.) Smith stated that she could stand up to 25 minutes without interruption; walk 12 feet without interruption; and sit up to an hour and a half without interruption. (R. at 37.) She stated that she helped her 12-year-old son with his homework. (R. at 38.)

Barry Hensley, a vocational expert, also was present and testified at Smith's hearing. (R. at 52-58.) Hensley was asked to consider a hypothetical individual of Smith's age, education and work history, who would be limited to simple,

repetitive, unskilled, light work that did not require more than occasional pushing and pulling, climbing of ramps and stairs, balancing, kneeling, stooping, crouching and crawling; that did not require more than frequent overhead reaching, handling, feeling and fingering; that did not require her to work around concentrated exposure to extreme temperatures; that did not expose her to hazardous machinery, unprotected heights, extensive background noise, climbing of ladders, ropes or scaffolds and vibrating surfaces; and that did not require more than occasional interaction with the general public. (R. at 54-55.) Hensley stated that the individual could not perform Smith's past relevant work, but that there were other jobs existing in significant numbers in the national economy that such an individual could perform, including those of a nonpostal mail clerk, an order clerk and an office helper. (R. at 55-56.) Hensley was asked to consider the same individual, but who would be limited to only occasional reaching. (R. at 56.) He stated that there would be jobs available that such an individual could perform, including jobs as an order clerk, a nonpostal mail clerk and a materials handler, packer and sealer. (R. at 56.) Hensley stated that, if the individual would be absent from work approximately two days a month on a consistent basis, there would be no jobs available that such an individual could perform. (R. at 57.) He stated that, should the individual be off-task up to 33 percent of the workday, there would be no jobs available that such an individual could perform. (R. at 58.)

In rendering her decision, the ALJ reviewed records from Joseph Leizer, Ph.D., a state agency psychologist; Dr. William Rutherford, Jr., M.D., a state agency physician; Dr. Hillery Lake, M.D., a state agency physician; Dr. Bert Spetzler, M.D., a state agency physician; Kelli Keller, B.S., a counselor; Frontier

Health; Dr. Aimee Coleman, M.D.; Holston Valley Hospital Medical Center; Dr. Linda Gemayel, M.S.; Woodridge Hospital; Dr. Todd A. Cassel, M.D.; and Sabrina Mitchell, F.N.P., a family nurse practitioner.

The record shows that Smith received treatment from Dr. Todd A. Cassel, M.D., and Sabrina Mitchell, F.N.P., from September 26, 2011, through April 21, 2014, for carpal tunnel syndrome; diabetes mellitus type II; hyperlipidemia; cervical radiculitis; bone loss; neck sprain; neck pain; low back pain; edema; fatigue; fibromyalgia; restless leg syndrome; tendonitis; depression; and anxiety. (R. at 432-509.) On September 26, 2011, Smith reported that her mood was controlled with medication. (R. at 504.) She denied depression and anxiety. (R. at 505.) On February 6, 2012, Smith reported that she stopped taking her medications. (R. at 499.) On August 1, 2012, x-rays of Smith's cervical spine showed spondylosis, degenerative disc disease and neural foraminal narrowing. (R. at 419.) X-rays of Smith's lumbar spine showed minimal to mild spondylosis with normal alignment and no fracture, subluxation or bony destruction. (R. at 419.) On October 5, 2012, a cervical MRI showed mild spondylosis, minimal disc space narrowing and no spinal cord compression. (R. at 415-16.) On November 28, 2012, electrodiagnostic testing of the left upper extremity was normal with no evidence of radiculopathy or neuropathy. (R. at 412-14.)

On January 7, 2013, Smith reported that she was "working hard." (R. at 481.) Examination of Smith's neck was benign, and no back or other musculoskeletal abnormalities were noted. (R. at 483.) On February 11, 2013, Smith reported that medication helped her back pain, and aside from some slight

swelling in her neck and thyroid, no abnormalities were noted. (R. at 479-80.) In May and June 2013, Dr. Cassel documented benign examination findings. (R. at 468, 472.) A June 20, 2013, bone density scan showed that Smith had not lost any significant height since age 18 and that her bone mineral density was in the low normal to osteopenic range. (R. at 408.) On September 10, 2013, Smith's neck was normal and supple, her thyroid unremarkable, and she had nontender muscles with full range of motion. (R. at 461.) On September 10 and 16, 2013, Smith's back was unremarkable, and she had full range of motion without pain, no edema, normal strength, 2+ reflexes and a normal gait. (R. at 457, 461-62.) It was reported that Smith's anxiety was stable, and exercise was encouraged. (R. at 458.) On November 4, 2013, Smith had slight tenderness with movement in her neck and mild para lumbar pain with trigger areas. (R. at 452.) A trigger point injection was provided. (R. at 453.)

On January 27, 2014, Dr. Cassel reported that Smith was alert and oriented; she had tenderness, tension and knots in the trapezius muscles and slight tenderness with movement. (R. at 449.) Smith received an injection. (R. at 450.) On April 4, 2014, Smith complained of back, neck and shoulder pain. (R. at 447.) On examination, she had tenderness in the trapezius muscle and the medial scapular areas and tightness in the paraspinal muscle. (R. at 447.) A trigger point injection was given. (R. at 447.) On April 21, 2014, Smith complained of panic attacks and back and shoulder pain. (R. at 443.)  Dr. Cassel reported that Smith was alert and oriented. (R. at 443.) Her examination was normal with the exception of tenderness in her trapezius muscle with limited range of motion. (R. at 443.) On June 5, 2014, Smith related frequent headaches for three weeks. (R. at 571.) She

had tenderness on examination, and was given a trigger point injection. (R. at 571.) On September 2, 2014, Dr. Cassel wrote a letter to the Virginia Department for Aging and Rehabilitative Services, wherein he stated that Smith was unable to work for more than a couple of hours due to multiple trigger points, muscle fatigue and regional pain problems. (R. at 579.) He did not assess any specific functional limitations or abilities in this letter. (R. at 579.)

On January 27, 2015, Dr. Cassel completed a Physical Residual Functional Capacity Questionnaire, indicating that Smith was diagnosed with depressive disorder; perhaps a personality disorder; myositis;[3] and chronic back pain. (R. at 807-11.) He noted that Smith's ability for attention and concentration would frequently interfere with her ability to perform simple work tasks. (R. at 808.) Dr. Cassel reported that Smith could tolerate low-stress jobs. (R. at 808.) He opined that Smith could walk up to two hours in an eight-hour workday and that she could walk up to 10 city blocks without interruption; sit up to four hours in an eight-hour workday and do so for up to one hour without interruption; and stand for up two hours in an eight-hour workday and do so for up to 30 minutes without interruption. (R. at 808-09.) Dr. Cassel opined that Smith would need to walk around for five minutes every hour. (R. at 809.) He found that Smith did not require a job that permitted her to shift positions at will from sitting, standing or walking. (R. at 809.) He reported that Smith occasionally would need to take a few minutes for an unscheduled break. (R. at 809.) Dr. Cassel opined that Smith could frequently lift and carry items weighing less than 10 pounds; occasionally lift and

---

[3] Myositis is defined as an inflammation of a muscle, especially a voluntary muscle, characterized by pain, tenderness, and sometimes spasm in the affected area. *See* STEDMAN'S MEDICAL DICTIONARY, ("Stedman's"), 543 (1995).

carry items weighing up to 10 pounds; and rarely lift and carry items weighing up to 20 pounds. (R. at 809.) He noted that Smith occasionally could look down, turn her head right or left and look up and frequently hold her head in static position. (R. at 810.) He reported that Smith could occasionally twist and rarely stoop, crouch/squat and climb ladders and stairs. (R. at 810.) Dr. Cassel noted that Smith would be absent from work about one day a month. (R. at 810.)

On May 29, 2015, Dr. Cassel wrote a "To Whom It May Concern" letter, wherein he stated that Smith was disabled from work due to accumulating difficulties associated with her cervical disc disease and fibromyalgia. (R. at 812.)

On October 3, 2011, Smith underwent an audiological evaluation due to hearing loss. (R. at 424-26.) Dr. Linda Gemayel, M.S., assessed mild to moderate sensorineural hearing loss with excellent speech discrimination. (R. at 424.) It was noted that Smith was not a candidate for hearing aids at that time. (R. at 424.)

On December 24, 2013, Smith was admitted to Holston Valley Hospital Medical Center for a drug overdose. (R. at 392-406.) On examination, Smith had full range of motion in all her extremities; was oriented to time, place and person; had intact cranial nerves; no extremity tenderness or edema; and a flat affect and poor eye contact consistent with depression. (R. at 395.) She was transported to Woodridge Hospital, ("Woodridge"), in stable condition. (R. at 394, 398, 428-31.)

Smith was admitted to Woodridge from December 24 through December 26, 2013, after attempting to ingest medication with alcohol. (R. at 428.) She related

stressors of being a single parent and missing two deceased children, but consistently denied it was a suicide attempt. (R. at 428.) Smith denied any other medical problems. (R. at 394.) No medication was found in Smith's system, and her alcohol level was increased, but not high. (R. at 397-98, 428.) At discharge, Smith was alert and oriented; calm; cooperative; made good eye contact; displayed no evidence of attention to internal stimuli; had a fine mood; full affect; linear, logical and goal-directed thought processes; no suicidal or homicidal ideation; no hallucinations or evidence of psychotic distortion; and fair to good judgment and impulse control. (R. at 429.) Her discharge diagnosis was major depressive disorder, recurrent, severe, without psychotic features. (R. at 429.)

On December 31, 2013, Smith presented to Frontier Health for an intake appointment following release from the hospital. (R. at 510-29.) She denied a suicide attempt, but related depression. (R. at 510.) Smith stated that she worked a 10-hour shift on Christmas Eve after having been up all night due to shopping. (R. at 510.) Once she returned home, she wrapped presents for her son and took Ativan and Ambien with tequila to sleep. (R. at 510.) However, she ultimately did not ingest the medication, and called a friend for help. (R. at 510.) Smith worked 32 hours weekly, but expressed interest in applying for disability. (R. at 512.) Kelli Keller, B.S., a counselor, diagnosed major depressive disorder and nicotine dependence. (R. at 522.) She assessed Smith's then-current Global Assessment of Functioning,[4] ("GAF"), score at 50,[5] with her highest GAF score being 55[6] and her lowest GAF score being 45 within the past six months. (R. at 522.)

---

[4] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC

On January 10, 2014, Smith reported that she was doing better and had fewer crying spells. (R. at 544-45.) She reported that she was back to work; her self-care skills were intact and unimpaired; her relationships with family and friends were intact; she attended church; she denied difficulty thinking clearly and increased irritability; and she denied suicidal ideations. (R. at 545.) Keller reported that Smith's concentration and memory were intact; she had a depressed mood and congruent affect; significant weight change; good eye contact and rapport; and normal and goal-directed thought content and process. (R. at 545, 548.) Her then-current GAF score was assessed at 55 to 60. (R. at 548.) On January 30, 2014, Smith reported that things had improved in her life and that therapy helped her. (R. at 541-42.) Smith reported socialization with friends and family. (R. at 542.) She had a euthymic mood with congruent affect; her grooming and dress were unremarkable; she denied suicidal ideations; and she was cooperative and communicative with appropriate eye contact. (R. at 541.) Keller reported that Smith was stable. (R. at 542.) On February 6, 2014, Smith related improvement on her current medication regimen. (R. at 537.) She denied any medication side effects or overwhelming panic, anxiety, mood swings or crying spells. (R. at 537.) Smith was calm and cooperative; had good eye contact and rapport; appropriate behavior; adequately answered questions; actively participated; displayed a euthymic mood and pleasant affect; and had no evidence of psychosis or change in

---

AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[5] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32.

[6] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

cognitive function. (R. at 537-38.) Keller encouraged Smith to not quit her job without having a backup plan and to file for disability if she could no longer physically work. (R. at 540.)

On March 6, 2014, Smith reported that she was "doing well," and her symptoms were improving. (R. at 535.) Smith reported that her medications were effective. (R. at 537.) She had recently traveled to Gatlinburg for a few days with her boyfriend and also went to Florida to visit her sister. (R. at 535.) Smith reported that her hours had been cut at work, but she was okay with it. (R. at 535.) Smith had a euthymic mood, was cooperative and communicative and denied suicidal ideation. (R. at 536.) She was encouraged to start a hobby. (R. at 536.) On April 3, 2014, Smith reported that she decided to leave her job because her hours had been reduced without any chance of an increase, and it was unprofitable to continue working. (R. at 533.) She reported that she planned to file for disability. (R. at 534.) Smith stated that her medication seemed to be helping. (R. at 564.) Keller reported that Smith had an anxious affect; she was appropriately dressed with "ok" grooming; and she had chewed her finger nails down into the quick. (R. at 534.) Smith stated that her major stressor was the recent change of not having a job or income. (R. at 534.) She reported that she was keeping her four-month-old grandchild. (R. at 534.) On May 1, 2014, Smith was alert and oriented, calm, cooperative and made good eye contact with good rapport. (R. at 530.) She was well-groomed; had appropriate behavior; adequately answered questions; conversed easily; and actively participated in treatment discussions. (R. at 530.) Smith had a euthymic mood and pleasant affect, and she had no symptoms of psychosis and showed no change in cognitive function. (R. at 530.) On June 5,

2014, Keller reported that Smith was stable. (R. at 558.) On June 11, 2014, Smith was alert and oriented; she was pleasant and cooperative; she interacted appropriately; she was casually dressed and adequately groomed; she made good eye contact; her thought processes were organized and logical; her mood was mildly depressed with a mildly anxious affect; her speech was clear; and there was no evidence of psychosis or suicidal ideations. (R. at 556.) On August 21, 2014, Smith reported that she had been experiencing some depression and stated that her major stressor was relationship issues. (R. at 767-70.)

On October 21, 2014, Keller wrote a "To Whom It May Concern" letter, wherein she stated that Smith's "mental health has prevented her from attaining and keeping gainful employment." (R. at 581.) No assessment of Smith's functional abilities was provided, and no objective findings, aside from diagnoses, were referenced. (R. at 581.) That same day, Smith related financial concerns due to pending restitution and court costs. (R. at 760.) She stated that "if she gets a job, she will 'mess up' her disability claim and she doesn't want to do that." (R. at 760.) Her mental status examination was benign, with only a slightly depressed mood; no suicidal ideation, good grooming; cooperative communication; and appropriate eye contact. (R. at 760.) On November 11, 2014, Smith was alert and oriented; pleasant and cooperative; she interacted appropriately; she was casually dressed and adequately groomed; she made good eye contact; her thought process was organized and logical; and her mood was euthymic with a mildly anxious affect. (R. at 755.)

On December 15, 2014, Smith denied suicidal ideation, intent, or plan; had normal gait; was calm and cooperative; displayed goal-directed thought processes; intact concentration; grossly intact memory; and fair judgment and insight. (R. at 748-49.) On December 23, 2014, Keller diagnosed major depressive disorder, nicotine dependence and bereavement. (R. at 737-38.) She assessed Smith's then-current GAF score at 50. (R. at 737.) On December 30, 2014, Smith reported that she was trying to stay busy and visit with family and friends. (R. at 747.)

On January 13, 2015, she stated that she recently went to the mall, and went grocery shopping with her boyfriend, and she reported feeling better when she went out. (R. at 745.) On January 26, 2015, Smith was cooperative, with varied euthymic to dysthymic mood, logical thought processes, no hallucinations and no suicidal ideation. (R. at 743.) On February 12, 2015, Keller reported that Smith was stable; her mood was mildly dysthymic with congruent affect; she made good eye contact; her home was clean and orderly; she was dressed casually and appropriately; and her grooming was fair. (R. at 388.) On March 11, 2015, Smith reported reading her Bible daily and attending church twice a month. (R. at 385.) On March 30, 2015, Smith reported that she was doing better. (R. at 384.) She reported attending church each Sunday. (R. at 384.) Smith stated that she was sleeping, eating and feeling well. (R. at 384.) On April 14, 2015, Dr. Aimee Coleman, M.D., a physician at Frontier Health, saw Smith, who reported financial difficulties. (R. at 380-82.) Smith stated that she had been walking for exercise. (R. at 380.) Dr. Coleman reported that Smith's gait and station were normal; she had normal speech; her thought content was goal-directed, linear and coherent; her mood was "not good;" her affect was mildly dysthymic; her concentration and

memory were intact; she denied suicidal ideations; she exhibited no evidence of psychosis; and her insight and judgment were deemed fair. (R. at 380.) That same day, Smith saw Jane Fanslow, L.P.C., for counseling. (R. at 382.) Fanslow reported that Smith's affect was blunted, her mood was mildly depressed and her thought process was logical. (R. at 382.) Also, on April 14, 2015, Keller reported that Smith was stable; her mood was mildly dysthymic with congruent affect; she was friendly, cooperative and participated in treatment discussions; her thoughts were linear, goal-oriented and relevant; she was well-groomed and adequately dressed; and she denied suicidal ideations. (R. at 383.)

On May 21, 2014, Joseph Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Smith had mild restrictions in her activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace; and that she had experienced one to two repeated episodes of decompensation of extended duration. (R. at 71.)

That same day, Leizer completed a mental assessment, indicating that Smith was moderately limited in her ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to interact appropriately with the general public; and to accept instructions and respond appropriately to criticism from supervisors. (R. at 74-76.) He noted that, despite these limitations, Smith would be able to meet the basic mental demands of competitive work on a sustained basis. (R. at 76.)

On May 21, 2014, Dr. William Rutherford, Jr., M.D., a state agency physician, opined that Smith had the residual functional capacity to perform light work. (R. at 72-74.) He opined that Smith could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 73.) No manipulative, visual or communicative limitations were noted. (R. at 73.) He found that Smith should avoid concentrated exposure to vibration and hazards, such as machinery and heights. (R. at 74.)

On August 7, 2014, Dr. Hillery Lake, M.D., a state agency physician, completed a PRTF, indicating that Smith had mild restrictions in her activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace; and that she had experienced one to two repeated episodes of decompensation of extended duration. (R. at 100-01.)

That same day, Dr. Lake completed a mental assessment, indicating that Smith was moderately limited in her ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to interact appropriately with the general public; and to accept instructions and respond appropriately to criticism from supervisors. (R. at 104-05.) She noted that, despite these limitations, Smith would be able to meet the basic mental demands of competitive work on a sustained basis. (R. at 105.)

On September 8, 2014, Dr. Bert Spetzler, M.D., a state agency physician, opined that Smith had the residual functional capacity to perform light work. (R. at 102-04.) He opined that Smith could occasionally climb, balance, stoop, kneel,

crouch and crawl. (R. at 102.) No manipulative, visual or communicative limitations were noted. (R. at 103.) He found that Smith should avoid concentrated exposure to vibration and hazards, such as machinery and heights. (R. at 103.)

On October 31, 2014, Smith presented to Wellmont Health System unresponsive and with an altered mental state. (R. at 635-62.) Smith denied depression or suicidal ideation, and no alcohol use or change in medication was noted. (R. at 636, 656.) On examination, Smith had normal range of motion in her neck, no musculoskeletal abnormalities or pain behaviors, normal mood and affect and normal behavior. (R. at 637.) Her family brought in a large sack of medication, some of which were unlabeled or duplicates. (R. at 656.) It was noted that Smith may have accidentally overdosed. (R. at 656.) Upon discharge, on November 3, 2014, Smith was alert and oriented, in no acute distress and had normal 5/5 strength throughout her body with intact sensation and normal affect. (R. at 658.) At her follow-up therapy appointment, Smith "convincingly denie[d]" any suicidal ideation and stated that her hospitalization was not the result of a suicide attempt. (R. at 757.)

On November 28, 2014, Smith presented to the emergency room after intentionally ingesting 10 50 mg doxepin capsules. (R. at 590-629.) Her son related that the anniversary of his brother's passing was a few days earlier. (R. at 590.) Although quite drowsy on admission, during a subsequent examination, Smith was alert and oriented to person, place, and time; in no distress; had normal range of motion in her neck; and no edema or musculoskeletal tenderness. (R. at 591-92.) She was transferred to Woodridge on December 2, 2014, for psychological care.

(R. at 698, 775-84.) While there, Smith was diagnosed with depressive disorder, not otherwise specified, and bereavement and assessed a GAF score of 30.[7] (R. at 783.) On December 15, 2014, Dr. Coleman noted that Smith had a good appetite and good concentration. (R. at 748.) She denied suicidal ideation, intent, or plan; had a normal gait; was calm and cooperative; and displayed goal-directed thought processes, intact concentration, grossly intact memory and fair judgment and insight. (R. at 748-49.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2016). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2016).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the

---

[7] A GAF score of 21 to 30 indicates that the individual's "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment … OR inability to function in almost all areas…." DSM-IV at 32.

claimant establishes a prima facie case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975).  Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion,

even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if she sufficiently explains her rationale and if the record supports her findings.

Smith argues that substantial evidence does not exist to support the ALJ's finding that she was not disabled. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 8-9.) Smith argues that the ALJ erred by failing to properly evaluate the opinions of her treating sources, Dr. Cassel and counselor Keller. (Plaintiff's Brief at 9-15.) Based on my review of the record, I find this argument unpersuasive. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (2016). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

The ALJ gave Dr. Cassel's assessment little weight because it was inconsistent with his own clinical findings and because it was not supported by the medical evidence of record as a whole. (R. at 19.) As noted by the ALJ, Dr. Cassel reported that Smith had only "slight" decreased range of motion in her neck, no radicular findings and no neurological deficits. (R. at 18-19, 807.) Diagnostic tests showed only minimal spondylosis. (R. at 415-16.) Electrodiagnostic testing

confirmed normal results with no evidence of radiculopathy or neuropathy. (R. at 412-14.) There were no lower back or leg abnormalities or evidence of reduced muscle strength documented by Dr. Cassel that supported a sitting and standing limitation for less than six hours. (R. at 457, 461-62, 468, 472.) While Smith, at times, had tenderness, Dr. Cassel noted that she had full range of motion in her neck and back without pain, with normal strength, gait and reflexes. (R. at 461-62.) Smith stated that she was walking for exercise and to reduce stress. (R. at 380.) She was observed, at that time, as having a normal gait and station. (R. at 380.) The Fourth Circuit has found that, when an opinion from a treating professional conflicts with his own contemporaneous notes, it is perfectly acceptable for the ALJ to reject the opinion or afford it little weight. *See Craig,* 76 F.3d at 590. Other evidence of record showed Smith to have normal range of motion in her neck; no musculoskeletal abnormalities; full strength throughout her body; intact sensation; and she denied muscle weakness. (R. at 591-92, 637, 658.) These objective findings do not support the degree of limitation assessed by Dr. Cassel. Therefore, I find that the ALJ reasonably noted that Dr. Cassel's opinion was inconsistent with his own clinical findings and other medical evidence of record.

The ALJ also gave little weight to Keller's opinion and the assessed GAF scores because they were inconsistent with her own clinical findings and not supported by the record as a whole. (R. at 19.) The ALJ also noted that she was giving little weight to the GAF scores assessed while Smith was hospitalized. (R. at 19.) She found that "[t]hese are snapshots at two points in time that are just days apart. By themselves, they cannot give an accurate longitudinal picture of [Smith's] day to day mental functioning over a period of months and even years."

(R. at 19-20.) Keller's records show that Smith had good concentration and grossly intact memory; she denied suicidal and homicidal ideation, intent or plan; she was calm and cooperative; she displayed a mildly depressed to euthymic mood; she had no change in cognitive function; and she had logical and goal-directed thought processes. (R. at 530, 556, 743, 748-49, 755, 763, 768.)

In addition to working for 20 months during the relevant time period, Smith cared for her school-aged son, spent time with her grandchild, had a boyfriend, independently performed her activities of daily living, walked for exercise and traveled to Gatlinburg and Florida. (R. at 380, 534-35, 745.) Smith stated she stopped working because her hours had been reduced without any chance of being increased, and it was no longer financially profitable to continue working. (R. at 533, 535, 562.) She stated that she contemplated getting a job, but did not want to do so because it would "mess up" her disability claim. (R. at 760.) The ALJ noted that she was giving great weight to the opinion of psychologist Leizer, which was affirmed by Dr. Lake, because it was consistent with the medical evidence of record, with the exception that the evidence did not support a finding that Smith would be limited to one-to-two step tasks given her wide array of daily activities. (R. at 19.) Furthermore, Smith repeatedly reported that her medication and therapy were helping, and Dr. Cassel and Keller noted that Smith's anxiety and depression were stable. (R. at 383-84, 386-87, 458, 535, 537, 541-42, 558, 564.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

Case 2:15-cv-00018-PMS   Document 15   Filed 02/10/17   Page 22 of 23   Pageid#: 920

Based on the above, I find that substantial evidence exists to support the ALJ's weighing of the medical evidence and her finding on Smith's residual functional capacity.

Based on the above reasoning, I find that substantial evidence exists to support the ALJ's conclusion that Smith was not disabled and not entitled to benefits. An appropriate Order and Judgment will be entered.

DATED:     February 10, 2017.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE